IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>v.<br><br>ADAM MICHAEL WEBBER,<br><br>       Defendant. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR A NEW TRIAL**<br><br>Case No. 2:14-cr-00443<br><br>District Judge Dee Benson |

Before the Court is Defendant Adam Michael Webber's ("Mr. Webber") Motion for a New Trial.[1]  Having reviewed the parties' briefs and the relevant law, the court renders the following Memorandum Decision and Order.[2]

## BACKGROUND

Mr. Webber has a long and litigious history with the government and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").[3]  In 2007, after the ATF conducted an investigation into Mr. Webber's alleged illegal firearm sales, Mr. Webber and the ATF entered into a civil settlement agreement.[4]

Under the terms of the 2007 settlement agreement, the ATF partially dismissed the civil forfeiture action against Mr. Webber.[5]  In return, Mr. Webber agreed "never to apply for a Federal firearms license or be a responsible person for any Federal firearms licensee or business," and further agreed that he would "not engage in the business of manufacturing,

---

[1] Dkt. No. 236.
[2] Pursuant to DUCrimR 12-1(d), the court elects to determine the present motion on the basis of the written memorandum and finds that oral argument would not be helpful or necessary.
[3] Transcript of the trial of Adam Michael Webber held from September 13 to September 23, 2016, will be referenced as "Tr. at."
[4] Gov. Ex. 1.17; Tr. at 408:5–10.
[5] Gov. Ex. 1.17 at ¶ 10.

importing, or dealing in firearms."[6]  Additionally, Mr. Webber acknowledged that not engaging

in the business of dealing in firearms meant Mr. Webber could not "repetitively" acquire and

resell firearms "with the intent to make a profit."[7]

After the 2007 settlement, Mr. Webber began selling firearms parts through his business

called HK Parts, Inc. ("HK Parts").[8]  Mr. Webber operated HK Parts out of his home in Salt

Lake City, Utah.  As Mr. Webber's business grew and prospered, the ATF grew suspicious of

Mr. Webber's activities, including the possibility that Mr. Webber was selling firearms.  An

investigation into Mr. Webber's business was opened in 2010 and concluded in August of 2014.[9]

After the investigation, a grand jury in Salt Lake City returned a thirteen count indictment

charging Mr. Webber with various firearms, export, false statement, and tax offenses.[10]

Based on motions from the government and Mr. Webber, the government's thirteen count

indictment was reduced to a six count indictment.[11]  Count 1 charged Mr. Webber with dealing

in firearms without a license as follows:

> On a date unknown to the grand Jury, but beginning no later than 2007, through
> in or about May 2012, in the Central Division of the District of Utah,
>
> **ADAM MICHAEL WEBBER**,
>
> defendant herein, willfully engaged in the business of dealing in firearms without
> a license; in violation of 18 U.S.C. § 922(a)(1)(A).[12]

---

[6] *Id.* at ¶ 12.
[7] *Id.* at ¶ 13 (noting, Mr. Webber's "sale and disposal of his personal collection of firearms" would not render Mr. Webber to be engaged in the business of dealing in firearms).
[8] Tr. at 54:25–55:4.
[9] Tr. at 52:24–53:2.
[10] Dkt. No. 1.
[11] The government moved to dismiss several counts prior to trial.  *See* Dkt. Nos. 189, 191, 222. Additionally, upon Mr. Webber's motion, the Court dismissed the four export violation counts which alleged Mr. Webber violated 18 U.S.C. § 554.  *See* Dkt. Nos. 99, 155.
[12] *See* Dkt. Nos. 60 and 231 at Instruction No. 18.

Counts 2, 3, and 4 charged Mr. Webber with filing false Individual U.S. Income Tax Returns for the 2007, 2008, and 2009 tax years in violation of 26 U.S.C. § 7206(1).[13]  Similarly, Counts 5 and 7[14] charged Mr. Webber with filing false U.S. Income Tax Returns for HK Parts for the 2009 and 2010 tax years in violation of 26 U.S.C. § 7206(1).[15]

From September 13 to September 23, 2016, the government's case against Mr. Webber was presented to a jury.[16]

### A. Count 1, Violation of the Gun Control Act

At trial, the government's evidence showed that Mr. Webber sold his first firearm through HK Parts in 2008 and by 2012 Mr. Webber had bought and sold approximately 2,000 firearms through HK Parts.[17]  Between 2008 and 2012, Mr. Webber never applied for a Federal Firearms License ("FFL").  Rather, at trial it was revealed that beginning in 2009, Mr. Webber operated his business under the FFL of Midnight Labs, LLC ("Midnight Labs"), which was owned by Mr. Bryan Croft.[18]

The evidence showed that on September 30, 2009, Mr. Webber entered into an agreement with Midnight Labs entitled "Employment Contract."[19]  The Employment Contract purported to make Mr. Webber an employee of Midnight Labs.[20]  However, evidence presented by the government demonstrated that Mr. Webber did not receive any financial compensation from

---

[13] *See* Dkt. No. 231 at Instruction Nos. 25, 27, 29.
[14] The second superseding indictment was not renumbered to provide that the sixth count in the indictment was labeled as Count 6.  Therefore, the indictment and corresponding jury instructions included Counts 1, 2, 3, 4, 5, and 7, culminating in a six count indictment.  *See* Dkt. No. 231.
[15] *See* Dkt. No. 231 at Instruction Nos. 31, 33.
[16] *See* Dkt. Nos. 222–29.
[17] *See* Tr. at 106:18–107:17; 858:15–18; 859:7–9.
[18] *See* Tr. at 345:5–15; 486:2–3; 858:15–20; 859:1–11.
[19] Gov. Ex. 1.10; Tr. at 143:3–15.
[20] Tr. at 144:6–17.

Midnight Labs.[21]  Mr. Webber financed the firearms purchased through Midnight Labs' FFL.[22]

Additionally, Mr. Webber and HK Parts retained any profit generated from the firearms

purchased and resold using Midnight Labs' FFL.[23]

The government's evidence also demonstrated that Mr. Croft performed a number of

tasks for Mr. Webber and HK Parts.  Mr. Croft maintained Midnight Labs' Acquisition and

Disposition Book ("A&D book").[24]  An A&D book is required by the holder of a FFL to track

the firearms that come into the possession of the FFL and where the firearms are subsequently

transferred.[25]  Mr. Croft testified that when Mr. Webber purchased firearms to be resold to HK

Parts' customers, the firearms were delivered to Mr. Croft.[26]  Once received by Mr. Croft, Mr.

Croft entered the firearms into Midnight Labs' A&D book.[27]  After Mr. Croft entered the

firearms into Midnight Labs' A&D book, the firearms were delivered to Mr. Webber's home.[28]

Mr. Croft testified that he routinely delivered firearms purchased by Mr. Webber to Mr.

Webber's home.[29]  Additionally, Mr. Croft testified that he would often help Mr. Webber

package firearms to be sold to HK Parts' customers.[30]  Mr. Croft and Midnight Labs did not

receive any monetary compensation from Mr. Webber.[31]   Rather, Mr. Croft testified that, in

exchange for his services, he obtained access to Mr. Webber's industry contacts and

relationships.[32]

---

[21] Tr. at 404–405.
[22] Tr. at 374:2–3.
[23] Tr. at 355:25–356:5.
[24] Tr. at 361:12–25.
[25] Tr. at 129:22–130:10.
[26] Tr. at 365:8–23.
[27] *Id.*
[28] *Id.*
[29] *See* Tr. at 365:24–366:2.
[30] Tr. at 371:11–17.
[31] *See* Tr. at 371:11–17; 375:8–13.
[32] *Id.*

Additionally, the government's evidence demonstrated that in comparison to Mr. Webber, Mr. Croft bought and sold very few firearms through Midnight Labs' FFL. For example, between the time Midnight Labs was issued a FFL and when the ATF executed a search warrant in this case, Mr. Webber purchased approximately 2,066 firearms.[33] Conversely, Mr. Croft only purchased 170 firearms through Midnight Labs' FFL.[34]

Moreover, the government presented evidence that Mr. Webber directed all of the business activities for HK Parts. Mr. Webber decided which firearms to purchase and at what price the firearms should be resold through HK Parts.[35] Additionally, Mr. Webber determined the content on HK Parts' website, hkparts.net.[36] Mr. Croft testified that he did not make any business decisions for HK Parts.[37]

The government's evidence demonstrated that from the public's perspective, HK Parts was not operating under the umbrella of Midnight Labs. Throughout Mr. Webber's relationship with Midnight Labs, HK Parts' website represented that HK Parts had a FFL and the firearms purchased through HK Parts would be facilitated by HK Parts' FFL.[38] Moreover, two HK Parts' customers, including an undercover ATF agent, testified that when they purchased firearms from HK Parts, Midnight Labs was not mentioned during the transaction.[39]

Prior to trial, it was readily apparent that Mr. Webber's defense to Count 1 was that Mr. Webber, as an employee of Midnight Labs, was not engaged in the business of dealing in

---

[33] Tr. at 858:15–18
[34] Tr. at 858:19–20.
[35] *See* Tr. at 365; 366:3–10; 368:19–367:1; 370:9–19; 923:6–8.
[36] Tr. at 922:1–13
[37] *See supra* Note 35.
[38] Tr. at 361 (testifying that during the relevant time period hkparts.net represented: "we are a licensed FFL/SOT (0702)"). The defense denies this characterization of the statement on HK Parts' website. The defense put forth evidence that when hkparts.net referenced HK Parts' FFL, the website was merely referring to Midnight Labs. *See* Tr. at 934:6–8.
[39] Tr. at 28:18–29:6; 540:3–8.

firearms without a license.  In other words, Mr. Webber sought to put forth an agency defense

that he was not engaged in the business of dealing in firearms without a license because he was

an employee of Midnight Labs and Midnight Labs had a FFL.

The government argued that Mr. Webber's agency defense was unsupported by the law

and the facts and motioned for the Court to prohibit Mr. Webber from presenting an agency

defense to the jury.[40]

The Court agreed with the government that there were insufficient facts to allow Mr.

Webber to present an agency defense to the jury.[41]  The Court's finding was bolstered by the fact

that Mr. Webber had previously agreed with the ATF not to apply for a FFL or engage in the

business of dealing in firearms.

With this factual backdrop in mind, the government proposed the following instruction to

inform the jury about the law surrounding Mr. Webber's use of Midnight Labs' FFL:

> An agent or employee of a company possessing a federal firearms license, who
> could not have legitimately obtained a license to deal firearms, may not deal
> firearms by positioning himself as a consultant or agent for the company. In other
> words, an agent or employee is not insulated from criminal liability by the fact
> that his principal or employer authorized his conduct.[42]

The Court found that the government's proposed instruction was overly broad and was a

misstatement of the law.  Therefore, after much discussion with counsel on the matter, the Court

instructed the jury as follows:

INSTRUCTION NO. 24

> A person prohibited from obtaining a federal firearms license, who 'engages in
> the business' of dealing in firearms as defined in Instruction Number 20, may not
> avoid the licensing requirement by positioning himself as an employee,
> consultant, or agent of a company possessing a federal firearms license. In other
> words, an employee, consultant, or agent who engages in the business of dealing

---

[40] Dkt. No. 137 at 2.
[41] Dkt. No. 162 at ¶ 6.
[42] Dkt. No. 179 at Instruction No. 30.

in firearms is not insulated from criminal liability by the fact that his principal or employer, who has a federal firearms license, authorized his conduct.[43]

Instruction 20 defined "engaged in the business" of dealing in firearms as:

a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.[44]

## B. Tax Counts

At trial, the evidence showed that from 2007 to 2010, there was considerable discrepancy between the revenue received by Mr. Webber and HK Parts and the amount of gross receipts reported to the Internal Revenue Service.

For example, on Mr. Webber's 2007 and 2008 U.S. Individual Income Tax Returns, Mr. Webber reported gross receipts in the amount of $23,185 and $22,039 respectively.[45]  Similarly, on HK Parts' 2009 and 2010 corporate tax returns, Mr. Webber reported gross receipts in the amount of $49,742 and $84,749 respectively.[46]  Conversely, the government presented evidence that the gross receipts for Mr. Webber and HK Parts were underreported.  For example, the government put forth evidence that Mr. Webber had gross receipts in the amount of $1,048,475 and $2,597,283 for the 2007 and 2008 tax years.[47]  Similarly, the government offered evidence that Mr. Webber and HK Parts had gross receipts in the amount of $3,627,471 for the 2010 tax year.[48]  These discrepancies formed the basis for the five tax counts against Mr. Webber.

---

[43] Dkt. No. 231 at Instruction No. 24. The defense objected to Instruction No. 24.  Transcript of Jury Instruction Conference for the Trial of Adam Michael Webber, September 22, 2016, at 23:12–24.  The defense's objection was overruled and Instruction No. 24 was presented to the jury for their consideration.
[44] *Id.* at Instruction No. 20.
[45] Tr. at 601:13–15; 607:18–608:1.
[46] Tr. at 615:21–23; 621:10–13.
[47] Tr. at 741:1–6.
[48] Tr. at 741:22–25.

**C. Excluded Witness Testimony**

At trial, the Court excluded two witnesses: Mr. José Diaz and Ms. Jessica Filippi.  The defense purported that Mr. Diaz would have testified that some of the firearms sold through Mr. Webber's website in 2008 and 2009 were in the possession of Mr. Diaz's company, Michael's Machines.[49]  At the beginning of trial, the government invoked the exclusionary rule pursuant to Federal Rule of Evidence 615.

As the government's case progressed, the government notified the Court that Mr. Webber's mother was present in the gallery and had been communicating via text message to Mr. Webber's wife about the progression of the trial.[50]  Mr. Webber's wife was slated to act as a witness for the government.  The Court admonished both sides to monitor their witnesses to make sure the exclusionary rule was honored.[51]

During the defense's case, the defense called Mr. Diaz to the stand.[52]  Before Mr. Diaz could testify, the government notified the Court that Mr. Diaz had been present during opening statements and during the government's first witness.[53]  The government moved to exclude Mr. Diaz for the defense's violation of the exclusionary rule.[54]  Mr. Diaz was an acquaintance of Mr. Webber.  Therefore, the Court rejected the defense's argument that the defense was wholly unaware of Mr. Diaz's presence.[55]  Additionally, it was brought to the Court's attention that the defense did not disclose that Mr. Diaz was going to testify until the night before Mr. Diaz took

---

[49] Dkt. No. 236 at 19.
[50] Tr. at 474:9–19.
[51] Tr. at 474:20–475:6.
[52] Tr. at 1059:2–3.
[53] Tr. at 1059:19–1060:5.
[54] Tr. at 1059:19–1060:12.
[55] Tr. at 1068:3–12.

the stand.[56]   The Court found that Mr. Diaz heard enough critical information to color his

testimony and, therefore, sustained the government's objection to exclude Mr. Diaz.[57]

Ms. Filippi is an employee of the accounting firm Cook Martin Poulson P.C.  Since 2011,

Ms. Filippi has been employed by Mr. Webber to prepare Mr. Webber's individual and business

tax returns.[58]  During the defense's case, the defense called Ms. Filippi to testify.  Shortly after

her testimony began, the government motioned to exclude Ms. Filippi's testimony on relevance

grounds.[59]  The defense offered that Ms. Filippi would testify to the following: (1) Mr. Webber

asked Ms. Filippi in 2011 to prepare his taxes going forward; (2) Mr. Webber's bookkeeping and

accounting was in disarray; (3) Mr. Webber lacked records that an accountant would expect to

adequately prepare a tax return; and (4) Ms. Filippi, after reviewing Mr. Webber's 2010 tax

return, offered to amend Mr. Webber's 2010 return.[60]

The Court sustained the government's objection.  The Court found that Ms. Filippi's

proposed testimony was minimally relevant.[61]  However, the Court held that Ms. Filippi's

testimony was cumulative, risked confusing and misleading the jury, and risked directing the

jury on Mr. Webber's consciousness of guilt or lack of consciousness of guilt.[62]  Moreover, the

Court was concerned that Ms. Filippi's testimony would run afoul of the propensity ban.[63]

Therefore, Ms. Filippi was excused.[64]

---

[56] Tr. at 813:10–22.
[57] Tr. at 1069:15–16.
[58] Tr. at 993:6–13, 994:25–995:6, 1005:21–25.
[59] Tr. at 1005:21–1006:5.
[60] Dkt. No. 236 at 26–27 (citing to the record).
[61] Tr. at 1017:18–19.
[62] Tr. at 1018:15–1019:4.
[63] Tr. at 1021:4–14.
[64] Tr. at 1021:18–19.

**D. Jury Verdict and Motion for a New Trial**

On September 23, 2016, the Jury returned a unanimous verdict finding Mr. Webber guilty on all counts.[65]  Following the verdict, the government sought to detain Mr. Webber pending sentencing.[66]  The Court denied the government's motion and Mr. Webber was permitted to remain on pretrial release.[67]  On October 7, 2016, Mr. Webber filed a Motion for a New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.[68]  Mr. Webber's sentencing is presently set for January 24, 2017.[69]

## DISCUSSION

Rule 33(a) provides, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A motion for a new trial is not regarded with favor and is only issued with great caution."  *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir. 2007) (citations omitted).  When reviewing a motion for a new trial, a conviction should not be disturbed if a "'reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom.'"  *United States v. Irving*, 665 F.3d 1184, 1193 (10th Cir. 2011) (quoting *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008)).  With respect to the jury's factual determinations, the Court is not permitted to "'weigh conflicting evidence or second-guess the fact-finding decisions of the jury.'"  *Id.* (quoting *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007)).

However, Rule 33 places discretion with the trial judge to review the trial record and grant a new trial in the "interests of justice."  *See United States v. Patterson*, 41 F.3d 577, 579

---

[65] Dkt. No. 230.
[66] Dkt. No. 229.
[67] *Id.*
[68] Dkt. No. 236.
[69] Dkt. No. 250.

(10th Cir. 1994) (noting that "the decision to grant or deny a motion for new trial rests within the trial court's discretion . . . .").

Mr. Webber points to three of the Court's rulings as grounds for a new trial on all counts. First, Mr. Webber argues that Instruction No. 24 incorrectly described the law with respect to the Gun Control Act's licensing requirement and improperly withheld a factual question from the jury.[70]  Second, Mr. Webber claims he was unfairly prejudiced by the exclusion of Mr. Diaz because Mr. Diaz could have testified that Mr. Diaz was in physical possession of the firearms receivers sold through HK Parts prior to Mr. Webber's relationship with Midnight Labs.[71]  Finally, Mr. Webber claims he was prejudiced by the exclusion of Ms. Filippi's testimony because Ms. Filippi would have provided "critical evidence" of Mr. Webber's lack of willfulness to submit false tax returns.[72]  Each of Mr. Webber's arguments will be discussed in turn.

## A. Instruction No. 24

It is axiomatic that the Court's duty is to instruct the jury on the state of the law.  When a party challenges the validity of a jury instruction, the Court may "only order a new trial if an error in the instructions resulted in a miscarriage of justice."  *Pers. Dep't, Inc. v. Prof'l Staff Leasing Corp.*, 297 Fed. App'x 773, 784 (10th Cir. 2008) (unpublished) (citing *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1516 (10th Cir.1984)).  In reviewing a jury instruction for error, the Court reviews the instructions as a whole "'to determine whether the jury may have been misled, upholding the judgment in absence of substantial doubt that the jury was fairly guided.'"  *United States v. Magleby*, 241 F.3d 1306, 1310 (10th Cir. 2001) (quoting *United States v. Fabiano*, 169 F.3d 1299, 1302–03 (10th Cir. 1999)).  Furthermore, "[t]he admission or exclusion of a jury instruction is within the discretion of the trial court . . . ."  *Craig*

---

[70] Dkt. No. 236 at 7–18.
[71] *Id.* at 19–22.
[72] *Id.* at 25–27.

*v. Murphree*, 35 F. App'x 765, 769 (10th Cir. 2002) (unpublished) (citing *Richards v. Attorneys' Title Guar. Fund, Inc.*, 866 F.2d 1570, 1575, 1573 (10th Cir.1989)).

As a general principle, "a party is entitled to an instruction based on its theory of the case whenever [the party] produces sufficient evidence to support it and submits an instruction that is a correct statement of the law." *Id.* (citing *F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1222 (10th Cir. 2000)).  Indeed, the Tenth Circuit has held that denying a defendant the right to submit a factually and legally supported theory to the jury is grounds to overturn the defendant's conviction.  *See Steiger v. United States*, 373 F.2d 133, 135–36 (10th Cir. 1967); *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994).

The factual underpinnings of this case are unique to the typical cases the Court hears under the Gun Control Act.  Indeed, Mr. Webber's past dealings with the ATF and his subsequent use of Midnight Labs presented a matter of first impression under the Gun Control Act.  For the reasons that follow, the Court finds that Mr. Webber is entitled to a new trial on Count 1.  The Court agrees with the defense that denying Mr. Webber an agency defense was improper.  Mr. Webber should have been allowed to argue to the jury that Midnight Labs, not Mr. Webber, was engaged in the business of dealing in firearms.

Pursuant to 18 U.S.C. § 922(a)(1)(A) of the Gun Control Act, it is unlawful "for any person—except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms."  A willful violation of 18 U.S.C. § 922(a)(1)(A) may result in criminal liability.  *See* 18 U.S.C. § 924(a)(1)(D).  Liability under § 922(a)(1)(A) centers on the Gun Control Act's definition of what it means to be engaged in the business of dealing in firearms.

Relevant to Mr. Webber's case, a "dealer" for purposes of § 922(a)(1)(A) is "any person engaged in the business of selling firearms at wholesale or retail . . . ." 18 U.S.C. § 921(a)(11)(A).  In turn, a dealer "engaged in the business" of dealing in firearms is defined as a

> person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C).  The term "with the principal objective of livelihood and profit" is defined under the Gun Control Act as when the defendant's "intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection . . . ." 18 U.S.C. § 921(a)(22).  According to the ATF's regulations, "[e]ach person intending to engage in business as . . .  a dealer in firearms shall, before commencing such business, obtain the license required . . . for the business to be operated."  27 C.F.R. § 478.41(a) (2008).

In simpler terms, the statutory text of the Gun Control Act and the ATF's implementing regulations prohibit a person from repetitively buying and selling firearms for profit without first obtaining a FFL.  The extent to which an employee may utilize a dealer's FFL without running afoul of the Gun Control Act's licensing requirement is the more complex unanswered question. There is very little case law defining the contours of an available agency defense to the Gun Control Act's licensing requirement.

In *United States v. King*, 735 F.3d 1098 (9th Cir. 2013), the defendant claimed that he was entitled to argue to the jury that he was not guilty of unlicensed firearms dealing because he only acted on behalf of a licensed corporate entity.  *See id.* at 1104.  As a non-immigrant alien, the defendant was ineligible for a license to deal firearms in the United States.  *Id.* at 1101.  The

defendant utilized an acquaintance to obtain a FFL under the name of the defendant's incorporated entity. *Id.* at 1101–02. The defendant listed his acquaintance as the CEO of the entity and the responsible person for purposes of the FFL. *Id.* at 1101. Subsequently, the defendant began engaging in the business of dealing in firearms under his illegally obtained license. *Id.* at 1102. At trial, the defendant asked for a jury instruction that allowed him to argue that he could not be found guilty of unlicensed firearm dealing because he only acted on behalf of his corporate entity. *Id.* at 1104.

The Ninth Circuit upheld the district court's decision to prohibit the defendant's agency defense. *Id.* The court held that the defendant's proposed agency defense "would undermine—if not emasculate—the comprehensive licensing scheme designed by Congress." *Id.* (citing cases). The court recognized that the Gun Control Act affords the opportunity for a person to use a FFL through a corporate entity. *Id.* However, the Gun Control Act "simultaneously recognizes the limits of this legal fiction." *Id.* at 1105. For example, the ATF is permitted to look beyond an entity and determine the related persons and entities directing the applicant's operation and management. *Id.* Accordingly, the defendant's agency defense would allow the defendant "to skirt federal law by incorporating a front corporation with a straw principal, and then dealing firearms with impunity as a so-called 'agent' of the company." *Id.* The court stated it was "hard pressed to believe that Congress would have intended such an easy workaround to such a complex, pervasive regulatory scheme." *Id.*

Likewise, in *United States v. Fleischili*, 305 F.3d 643 (7th Cir. 2002), the defendant was convicted of illegally possessing machineguns in violation of 18 U.S.C. § 922(o). *Id.* at 651. The defendant was a convicted felon and argued he was entitled to argue that his firearm possession was lawful because at the time he possessed it, the defendant was acting as an agent

of a corporation holding a FFL. *Id.* at 652. The Seventh Circuit upheld the defendant's conviction, finding: "a convicted felon who could not have legitimately obtained a manufacturer's or dealer's license may not obtain access to machine guns by setting up a sham corporation." *Id.* The court further held that the Gun Control Act, "when viewed as a whole was never intended to allow convicted felons to hide behind a corporate charter to gain access to the most heavily regulated firearms . . . ." *Id.*

Like *King* and *Fleischili*, Mr. Webber's proposed agency defense presented two questions to the Court. First, the Court had to answer the legal question of whether Mr. Webber could legitimately use Midnight Labs' FFL under any circumstances. Second, if the law supported an agency defense, the Court must then determine whether Mr. Webber had presented sufficient facts at trial to support the defense.

Based on this limited case law and the government's proposed interpretation of the Gun Control Act, the Court concluded that Mr. Webber could not assert an agency defense.

However, upon further review, the Court finds this legal determination was in error. As outlined above, the statutory text of the Gun Control Act requires any person "engaged in the business" of dealing in firearms to obtain a FFL. To determine whether a defendant may assert an agency defense under § 922(a)(1)(A), the statutory text requires the Court to focus on which party is "engaged in the business" of dealing in firearms. The Gun Control Act defines "engaged in the business" of dealing in firearms with precision. A person who engages in the business of dealing in firearms is as a person who engages in the "repetitive purchase and resale of firearms" with the "principal objective of livelihood and profit." 18 U.S.C. § 921(a)(21)(C).

In theory, if the jury were to conclude that Mr. Webber was not engaged in the business of dealing in firearms—meaning the profit motive and the other requirements associated with

15

such business remained with Mr. Croft and Midnight Labs—Mr. Webber could escape criminal liability by virtue of an agency defense. Taking the evidence presented by Mr. Webber in the light most favorable to Mr. Webber, Mr. Webber presented sufficient evidence to support such a defense. Accordingly, it was error to preclude Mr. Webber from presenting his agency defense to the jury.

The Court wishes to stress the narrow legal landscape surrounding Mr. Webber's agency defense. If the government resolves to retry Mr. Webber, the Court will attempt to properly instruct the jury that if they find that Mr. Webber himself was engaged in the business of dealing in firearms for his own profit and, therefore, was not in fact acting as a bona fide employee of Midnight Labs, the law under those circumstances would not allow Mr. Webber to escape criminal liability by representing that he was merely an employee of Midnight Labs. Under such circumstances, Mr. Webber would need his own FFL to comply with the Gun Control Act's licensing requirement.

To illustrate, an apt analogy would be the Gun Control Act's application to an employee of a gun wholesaler like Cabela's. Let us assume Cabela's hires an employee who has had past dealings with the ATF and, like Mr. Webber, agreed not to engage in the business of dealing in firearms. There is nothing in § 922(a)(1)(A), the ATF's regulations, or the employee's agreement with the ATF, that would prohibit that employee from working at the firearms' counter at Cabela's. The statutory text only forbids a party from being "engaged in the business" of dealing in firearms without a license. Furthermore, the Gun Control Act's narrow definition of a party "engaged in the business" of dealing in firearms precludes our hypothetical Cabela's employee. Indeed, an employee of Cabela's is not engaged in the business of dealing in firearms

because Cabela's has the profit motive and Cabela's is the party engaged in the repetitive purchase and resale of firearms.

However, let us assume that the employee, who did not have his own FFL, began buying hundreds of guns from Cabela's and reselling them out of his home for personal profit. Cabela's maintains the A&D book, but the employee is not paid for his extracurricular activities. Under those facts, the Gun Control Act would prohibit the employee's conduct. The employee would not be permitted to circumvent the Gun Control Act's licensing requirement by engaging in the business of dealing in firearms with Cabela's FFL. Additionally, the employee's settlement agreement with the ATF would be probative evidence of willfulness. Based on the language of the settlement agreement, it could be argued that the employee knew or should have known what it would mean to engage in the business of dealing in firearms without a license.

Of course, this is not a perfect analogy. Mr. Croft testified that he authorized, for lack of a better term, Mr. Webber's conduct. In light of Mr. Webber's past dealings with the ATF and Mr. Webber's extensive knowledge of the firearms industry, Mr. Webber's reliance on Mr. Croft's "authorization" may be seen as a mere pretense to avoid criminal liability. However, Mr. Webber should have been entitled to present his theory to the jury. To determine Mr. Webber was truly acting under the direction of Mr. Croft, the jury would have to conclude that Mr. Webber was acting for the primary profit motive of Midnight Labs, not HK Parts. Conversely, if Mr. Webber was willfully repetitively buying and selling firearms for the profit of himself and HK Parts, Mr. Webber may be criminally liable for selling firearms without a license.

Additionally, the Court finds error in how Instruction 24 directed the outcome of Count 1. At trial, the Court addressed the jury on the law surrounding Mr. Webber's use of Midnight Labs' FFL as follows:

INSTRUCTION NO. 24

> A person prohibited from obtaining a federal firearms license, who 'engages in the business' of dealing in firearms as defined in Instruction Number 20, may not avoid the licensing requirement by positioning himself as an employee, consultant, or agent of a company possessing a federal firearms license. In other words, an employee, consultant, or agent who engages in the business of dealing in firearms is not insulated from criminal liability by the fact that his principal or employer, who has a federal firearms license, authorized his conduct.[73]

Instruction No. 24 attempted to navigate the intersection between the unusual factual circumstances of Mr. Webber's case and the Gun Control Act. However, the phrasing of Instruction No. 24 plausibly could have directed the jury to find Mr. Webber's use of Midnight Labs' FFL prohibited per se. Specifically, as outlined above, there is no legal support for the conclusion that a person prohibited by a civil settlement agreement from obtaining a FFL cannot assert an agency defense under any circumstances. Despite the Court's effort to direct the jury to focus on which party was engaged in the business of dealing in firearms, Instruction No. 24's use of the term "prohibited" was an unclear depiction of the law. At best, it was ambiguous. Instruction No. 24 could be perceived as directing the jury to believe that Mr. Webber, as a prohibited party under the terms of the 2007 settlement agreement, could not use Midnight Lab's FFL under any circumstances. This is not the law. Rather, the Gun Control Act only prohibits Mr. Webber from engaging in the business of dealing in firearms without first obtaining a license.

Based on the foregoing, Mr. Webber's Motion for a New Trial is GRANTED with respect to Count 1.

**B. Exclusion of Mr. Diaz**

In light of the Court's ruling on Count 1, the Court finds it unnecessary to address the exclusion of Mr. Diaz, whose testimony would have only been relevant to Count 1.

---

[73] Dkt. No. 231 at Instruction No. 24

**C. Exclusion of Ms. Filippi**

Ms. Filippi's testimony was properly excluded and does not provide Mr. Webber a basis for a new trial on the five tax counts.  Pursuant to Rule 402 of the Federal Rules of Evidence, the Court must admit any evidence that is relevant.  Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401(a), (b).  However, pursuant to Rule 403, the Court has "discretionary authority to exclude certain evidence when the prejudicial value of the evidence substantially outweighs its probative value."  *United States v. Guardia*, 135 F.3d 1326, 1328 (10th Cir. 1998).  For example, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

The defense offers that Mr. Webber's sole defense to the tax code violations was that Mr. Webber did not act willfully.[74]  The defense argues that Ms. Filippi would have provided testimony demonstrating that Mr. Webber did not know how to calculate gross receipts and that Mr. Webber did not know until 2011 that his gross receipts had previously been underreported.[75]

The Court properly excluded Ms. Filippi's testimony on several grounds.  Ms. Filippi's testimony had little relevance to the case.  Ms. Filippi began preparing Mr. Webber's tax returns in 2011.  None of the tax years Ms. Filippi aided Mr. Webber were at issue in the government's tax case against Mr. Webber.  The Court noted at trial, Mr. Webber

> did not seek accounting help for any of the years in question. He went in it appears undisputed to get help in having his 2011 taxes prepared. That's it. It did trigger some indication of possibly amending his 2010 return, but that didn't

---

[74] Dkt. No. 236 at 5.
[75] *Id.*

happen. No documents were turned over for that purpose. It's beyond the time period.[76]

In other words, Ms. Filippi's testimony was tangentially relevant to Mr. Webber's case. The fact that Mr. Webber recognized in 2011 that his taxes were incomplete does not inform the question of whether Mr. Webber acted willfully in underreporting his gross receipts in 2007, 2008, 2009, and 2010.

Additionally, Ms. Filippi's testimony was cumulative and risked confusing or misleading the jury. Mr. Webber's brothers, Tim and Ben Webber, and Mr. Webber's spouse, Cora Webber, testified that Mr. Webber's business was disorganized. The Court reasoned at trial:

> We've already heard from two or three witnesses that his accounting system was not organized and not very well developed, if there was one at all. In fact, the witnesses brought by Mr. Webber indicated that the place was just kind of working frantically to get product out, and that the accounting and the other records were, in terms of financial records were not well kept.[77]

The Court concluded that the minimal relevance of Ms. Filippi's Testimony was "substantially outweighed by the danger of confusing the jury, misleading the jury, directing them on the question of whether the defendant's conduct showed consciousness of guilt or lack of consciousness of guilt."[78]

Moreover, aside from the minimally relevant and prejudicial nature of Ms. Filippi's testimony, Ms. Filippi's testimony also risked violating the propensity ban. Pursuant to Federal Rule of Evidence 404(a)(1), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Rule 404(a)(2) and Rule 404(b) provide a litany of exceptions to this rule,

---

[76] Tr. at 1017:21–1018:2.
[77] Tr. at 1018:15–21.
[78] Tr. at 1018:22–1019:4.

none of which are relevant to how the defense attempted to present Ms. Filippi's testimony.  At

trial, the Court held:

> the defense wants to be able to argue to the jury what he did in 2011 informs what
> his mindset was in 2010, even though that's a gap, what he was doing in 2011 is
> different than what he was charged with doing in 2010 and the other earlier years.
> We don't usually allow evidence under Rule 404 to use propensity evidence to
> inform previous conduct. Even for criminal defendants, if we're going to bring in
> character evidence, we bring it in through opinion witnesses. We don't bring it in
> to look how he was in 2011, and that informs how his mindset must have been in
> 2010.[79]

The Court properly recognized that the Defense was attempting to use Ms. Filippi's testimony as

impermissible character evidence.  Therefore, the Court finds no error in the exclusion of Ms.

Filippi's testimony.

Based on the forgoing, Mr. Webber's Motion for a New Trial with respect to Counts 2, 3,

4, 5, and 7 is DENIED.

## CONCLUSION

In short, the Court finds error in how Count 1 was presented to the jury.  Therefore, Mr.

Webber's Motion for a New Trial with respect to Count 1 is GRANTED.  Mr. Webber's Motion

for a New Trial with respect to Counts 2, 3, 4, 5, and 7 is DENIED.

IT IS SO ORDERED.

Dated: January 13, 2017.

BY THE COURT:

_____
Dee V. Benson
United States District Judge

---

[79] Tr. at 1020:4–14.